O

JS - 6

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| K.M., a minor, by and through her Guardian Ad Litem, LYNN BRIGHT,<br><br>Plaintiff(s),<br><br>v.<br><br>TUSTIN UNIFIED SCHOOL DISTRICT,<br><br>Defendant(s). | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. SACV 10-1011 DOC (MLGx)<br><br>**O R D E R** DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

Before the Court are cross-motions for summary judgment filed by Plaintiff K.M. ("K.M."), by and through her Guardian Ad Litem, Lynn Bright,[1] ("Plaintiff's Motion") and Defendant Tustin Unified School District ("Defendant" or "the District") ("Defendant's Motion"). The Court has considered the moving, opposing, and replying papers to both motions,

---

[1] The Court refers to the Plaintiff only by her initials, as she is a minor. Many of the documents submitted by the parties reveal her full name, but the Court will take care not to do so.

as well as oral arguments, and has reviewed the extensive administrative record, and accordingly DENIES Plaintiff's Motion and GRANTS Defendant's Motion.

## I.     FACTUAL BACKGROUND

This case comes to this Court as both an appeal of an Administrative Law Judge's findings, as well as separate claims under the Americans with Disabilities Act; Section 504 of the Rehabilitation Act; and the Unruh Act.  The Court summarizes the relevant facts here, based on its careful review of the Administrative Record[2] and the additional evidence supplied by the parties.  Additional facts, as well as discussion of prior factual and legal determinations made by the Administrative Law Judge ("ALJ") will be discussed when necessary throughout this Order. However, the facts relevant for the appeal of the ALJ's findings are limited to a narrower time period than the facts relevant for K.M.'s claims under the remaining claims.

### **About K.M.**

Plaintiff K.M. is a deaf, sixteen year-old[3] girl attending high school within Defendant Tustin School District.  K.M. uses cochlear implants[4], and relies on lip-reading and her observations of social cues to communicate with others.  AR001556.  Plaintiff's Declaration of K.M. in Opposition to Motion for Summary Judgment by Tustin ("K.M. Decl."), ¶ 1.  Because of her difficulty hearing, she often needs to make eye contact so she can rely on her lip-reading and visual cues to follow along.  *See* AR000043.  K.M.'s primary mode of communication is spoken English, and she is an auditory/oral learner.  AR000811.  Her hearing loss in her right ear

---

[2]Citations to the Administrative Record are referred to by "AR."

[3]At the time of the due process hearing, K.M. was fifteen years-old.  *See* AR001893.

[4]Both parties note that until only recently, K.M. had a cochlear implant in her right ear and a hearing aid in her left ear, but had surgery in or around March of 2011 to implant a cochlear implant in her left ear.  The parties dispute whether this additional implant gives her improved hearing, and Plaintiff submits a Declaration of Margaret Winter ("Winter Decl.") in support of her argument that she still requires CART services. Defendant's objections to this late-filed Declaration are overruled in light of Plaintiff's argument that it was needed to rebut the District's argument that the second cochlear implant improved K.M.'s hearing so that she no longer requires captioning.

is considered in the minimal to mild range, and her left ear, with the help of a hearing aid, has been found to have hearing loss in the "mild to moderate or profound" range. AR000426, AR000974-000976; AR001991; AR002362.

K.M. qualifies for special education and since kindergarten, K.M. has been fully included in general education classes. AR001987, AR002012, AR002017. During that time, she has participated in weekly auditory-visual therapy ("AVT"), funded by the District. AR002012, AR002017. She received her AVT services from Karen Rothwell-Vivan ("Rothwell-Vivian"), a licensed audiologist and certified AVT therapist, who has worked with K.M. since she was about one year-old. AR000877.

### K.M.'s Disability and Its Effect on Her Classroom Experience

According to K.M., her disability affects her classroom experience. She expresses that "[i]t is very difficult for me to hear what is said in the classroom" and that it "is generally easier for me to hear the teacher compared to other students and class discussion." K.M. Decl. ¶ 2. As a result of her need to "concentrate and focus even more intently" to hear other students in class talk, as well as the fact that the majority of her teachers require student participation in class, K.M. "work[s] very hard to participate." *Id.* at ¶ 4. "At the end of the day, [K.M. is] emotionally very tired from all the intense concentration" and "come[s] home mentally exhausted from trying to listen." *Id.* at ¶ ¶ 2-3; AR001553. K.M. has especially struggled when teachers have played videos without captioning in class, and in portable classrooms, though the parties dispute whether this continues to be a relevant issue.

K.M.'s difficulty hearing impacts her ability to follow what is happening in classrooms, particularly student discussions. She reports that she will laugh at school when she sees others laughing and worries about looking stupid if others realize she did not catch the joke. AR001554. She also nods along even when she does not hear what people are saying, because in the past she learned that people get frustrated with her if she asks for clarification too often. *Id.* This at times results in her pretending to hear things she does not hear in class. AR01556. K.M. says she typically struggles to follow a teacher about once a day, and in some classes has trouble hearing student discussion as often as every five minutes. AR001538-1541.

3

K.M.'s teachers agreed to provide accommodations for her disability. These have included at time preferential seating, repeating student comments back, providing closed captioning at times on videos, and providing copies of notes. District's SUF, ¶¶ 23-24. K.M. has testified, however, that these accommodations were not always followed, and were violated in some instances, such as when one of her teachers frequently showed videos without captioning. *See* AR001544-1545; AR001547; *see also* K.M. Decl. Other evidence provided by Plaintiff also supports K.M.'s testimony that her teachers often forgot to repeat back classroom comments. AR000385; AR002114-2158.

Despite her difficulty in classes, K.M. has generally earned average to above-average grades in school. Many of her teachers have testified to the fact that she has participated in classes and appears to be following class discussions. *See* District's SUF, ¶¶ 25-27.

**CART, TypeWell, and FM Technologies**

As a result of the impact of her hearing loss on her education, K.M. seeks to be provided with Communication Access Real-time Translation ("CART"). The technology is comparable to court reporting, and involves a captionist entering spoken words and sounds into a machine, which then translates the entries into real-time captions to be displayed on a laptop computer screen. AR001895. CART provides word-for-word transcription. K.M. believes that access to CART would improve her comprehension as it is easier for her to read what people are saying than to try to listen. K.M. Decl ¶ 4. CART is used for students with hearing impairments in other public high schools in southern California, including Los Angeles Unified School District, Santa Monica Malibu Unified School District, and Irvine School District, among others. AR000305-306.

K.M. had the opportunity to test out CART, along with TypeWell, in both her English and Ancient Civilizations classes. AR001556-1557. She also observed CART being used at Santiago Community College. *Id.* She found CART extremely helpful, and preferred it to TypeWell, because it allowed her to follow along with exactly what was being said in class discussions. AR001557-1558. Nonetheless, she described TypeWell as "interesting" but did not find it as helpful as CART in some ways. AR001559-1560. According to the District, she also

informed her IEP team that she did, in fact, like TypeWell.  *See id.*

During middle school, the District had provided K.M. with access to FM Technology ("FM") in the classroom.  AR001989, AR002070, AR002174, AR002185, AR002209.  The personal FM system involved a microphone, which would be carried to each class for the teacher or speaker to hold, and a receiver to deliver the voice signal to the hearing aid or cochlear implant.   K.M. did not like the FM system, which picked up a lot of static when the teacher moved around.  The system would also distract K.M. by transmitting private conversations between the teachers and other students.  K.M. refused to use FM after eighth grade, finding that it gave her headaches and that it picked up on distracting, background noises such as the teacher's movements, and impeded her ability to focus. AR001551-1553; *see also* AR001235.

**IEP Meetings**

On June 9, 2008, at the end of K.M.'s seventh-grade year of school, the District held an annual Individualized Education Program ("IEP") meeting, which included, among others, K.M.'s middle school teacher, Jennifer Smith, and her mother. The purpose of this meeting was to develop K.M.'s special education program for eighth grade. The ALJ stated that under California's Standardized Testing and Reporting Program, K.M. scored proficient scores in English Language Arts and Math, and proficient scores in eighth grade.  OAH decision, AR001894.

At that meeting, K.M.'s mother ("Mother") first requested CART services be provided to K.M., based on her concerns about K.M.'s transition to high school.  Mother wanted to give the District sufficient time to research and budget for the CART services.  She also indicated that she was concerned about K.M.'s refusal to use the FM system in light of the fact that all her middle school teachers had been warning her that the amount of work and discussion would dramatically increase in high school.  AR001230-1231.  Mother also knew other parents whose children were using CART in school, and knew that K.M. had relied heavily on captioning in other areas of her life, including watching television.  *Id.*  Mother's request was noted in K.M.'s IEP, including the notation that Mother had provided information and research on the technology.  AR002270.  The District indicated it would respond to the request by June 25,

2008.  AR000031; AR00270; AR001233.  It failed to do so.  AR00074-75.

On June 5, 2009, at the end of K.M.'s eighth grade year, another IEP meeting was held. During that meeting, Karen Rothwell-Vivian presented her report to the IEP team, recommending that K.M. receive CART in all her academic high school classes so that she can access the information presented by her teachers and classmates.  AR002322.  Mother continued to request CART because of her concern about K.M.'s ability to hear class discussions. AR002286.  The parties dispute whether she requested CART for all classes or for only honors classes.  *See* Defendant Tustin Unified School District's Statement of Genuine Disputes of Material Fact ("District's SGD"), ¶ 83.  The District did not agree to provide CART and proposed conducting additional assessments of K.M., but did not specify which kind of assessments, despite Mother's questioning.  AR001248-1249.  As a result, Mother became frustrated, believing that the District was attempting to stall to avoid providing the CART services.  AR001251-1257.

On October 22, 2009, another IEP meeting was held with K.M. present.  At this point, K.M. had started high school, and expressed that she could not hear much of what was happening in class, "especially students behind and to the left of her."  AR002289.  She also indicated that she had a particularly hard time in portable classrooms and when students talk over each other, but admitted to feeling uncomfortable speaking out in class because of her uncertainty as to what other students have said.  AR002289.  She further explained that captioning was important because she could process writing more quickly than speech. AR001291-1292.  There is some dispute about whether K.M. raised her difficulties in certain classes to the District at this meeting; K.M. admits she may not have alerted the team to some problems in specific classes.  *See* AR001561.  The District once again offered K.M. use of the FM system, even though she explained that she did not want to force her classmates to pass around a microphone in class.  AR002289.  The District also raised the possibility of TypeWell, which Mother opposed, given its lack of word-for-word access.  AR001276-1277.

Another IEP meeting was held on February 20, 2010, during which K.M. described her preference for CART again.  Mother raised the problem of many videos in class not using

captioning. AR002294. Once again, the District promoted the FM system. AR002295. Rothwell-Vivian recommended CART for K.M., explaining her belief that it would allow her to follow class discussions and to improve her vocabulary and use of idioms, as well as develop note-taking skills. AR000895-947.

The parties dispute whether the requests for CART throughout the IEP meetings were seriously considered by the District. Plaintiff insists that throughout the IEP meetings, proponents of CART–including Mother, K.M., and Rothwell-Vivian–were not asked questions about CART and their support for it. *See* District's SGD, ¶¶ 66-104. Plaintiff further insists that the District improperly relied upon Maria Abramson, its audiologist, in rejecting CART services, despite her lack of expertise on CART. *See* Plaintiff's UF, ¶¶ 77-78. The District, however, points to the fact that Rothwell-Vivian's recommendation for CART was not personally tailored, as she makes that standard recommendation for each of her high school students and had not personally observed K.M. in the classroom. AR000935. Furthermore, Rothwell-Vivian had not considered other data available to the IEP team. AR000922.

**Procedural Background**

On July 31, 2010, K.M., acting through her Guardian ad Litem, filed a request for an administrative due process hearing ("DPH") before the Office of Administrative Hearings ("OAH") to force the District to provide K.M. with CART services. The DPH was conducted over eight days in April 2010. On June 1, 2010, the ALJ ruled in favor of the District and found that it was not obligated to provide K.M. with CART services. AR001923, ¶ 49. The ALJ further found that Defendant had attempted to assess K.M.'s needs for CART services and that the Individualized Education Program ("IEP") teams appropriately considered K.M.'s request for CART services. AR001918-1920.

On July 10, 2010, K.M. filed her Complaint in this Court. She appeals the ALJ's decision, and asserts claims under Section 504 of the Rehabilitation Act of 1973; the Americans with Disabilities Act; and the Unruh Civil Rights Act. K.M. moves for partial summary judgment and the District moves for summary judgment in full.

**II.    LEGAL STANDARD**

## A.    Administrative Record Review

Judicial review under IDEA is less deferential than in most administrative cases. *J.L. v. Mercer Island School Dist.*, 592 F.3d 938, 949 (9th Cir. 2010). When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, [and] hears any additional evidence" and "basing its decision on the preponderance of the evidence," can grant relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(C). In applying the preponderance of the evidence standard, the court must reach "'independent'" decisions. *Bd. of Educ. v. Rowley*, 458 U.S. 176 at 205 (internal citations to legislative history of IDEA omitted).

Nonetheless, "[b]ecause Congress intended states to have the primary responsibility of formulating each individual child's education" this Court must give "'due weight' to the decisions of the states' administrative bodies." *Hood v. Encinitas Union School Dist.*, 486 F.3d 1099, 1104 (9th Cir. 2007) (internal citations and quotations omitted). Accordingly, any "'thorough and careful' findings of a hearing officer are entitled to deference." *Id.* The Court must also "not substitute [its] opinions of sound educational policy for those of the school authorities which [it is] reviewing." *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). However, "the court is free to determine independently how much weight to give the state hearing officer's determinations." *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1008 (9th Cir. 2009).

## B.    Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). When the non-moving party bears the burden of

proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the opposing party must set out specific facts showing a genuine issue for trial; merely relying on allegations or denials in its own pleading is insufficient. *See Anderson,* 477 U.S. at 248-49. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION
### A.    Appeal of OAH
#### 1.    IDEA

In 1970, Congress first passed the Individuals with Disabilities Education Act ("IDEA") as part of the Education of the Handicapped Act, which it amended in the Education for All Handicapped Children Act of 1975. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005). Following further amendments in 1983 and 1986, Congress changed the name of the Act to the "IDEA" in 1990, but retained the same principles of the original Act. *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d at 947-948. Congress enacted the IDEA to allow for federal funding to aid states and local agencies in educating students with disabilities. The IDEA aimed to "ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education . . . ." 20 U.S.C. § 1415(a). The statute conditions federal financial assistance on a showing that there is "in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1).

The Act defined the notion of a "free appropriate public education," or "FAPE," as "special education and related services" which have been publicly funded and directed at no charge; that meet the standards of the state's educational agency; that include an "appropriate" education in the state; and "are provided in conformity with the individualized educations program required under section 614(a)(5)." Pub. L. No 94-142, § 4, 89 Stat. 773, 775 (1975) (codified as amended at 20 U.S.C. § 1401(8)(D)). Accordingly, in this case, the IDEA's requirement of a FAPE includes meeting the standards of California's law protecting equal communication access for students with hearing disabilities.

The "core" of the IDEA is the "'cooperative process that it establishes between parents and schools . . . .'" *Lake Washington Sch. Dist. No 414 v. Office of Superintendent*, 634 F.3d 1065, 1066 (9th Cir. 2011) (quoting *Schaffer v. Weast*, 546 U.S. 49, 53 (2005)). That cooperative process in providing students with a FAPE is achieved through the development of an individualized education program ("IEP") for each student with a disability. *Ojai Unified School Dist.*, 4 F.3d at 1469. An IEP is defined as "a written statement for each child with a disability that is developed, reviewed, and revised" by an IEP team consisting of the local educational agency, the student's teachers[5] and parents, and often, as was true at times in this case, the student herself. *See* 20 U.S.C. § 1414(a)(5); *Ojai Unified School Dist.*, 4 F.3d at 1469.

The Supreme Court in *Bd. of Educ. v. Rowley* established the controlling standard for defining a FAPE under IDEA. 458 U.S. 176 (1982). The Court found that states must give students with disabilities a "basic floor of opportunity . . . ." *Rowley*, 458 U.S. at 197. To comply with IDEA, the IEP must be "reasonably calculated to enable the child to receive educational benefits." *R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1121 (9th Cir. 2011) (citations omitted). Under *Rowley*, schools are not required to provide "every special service necessary to maximize each handicapped child's potential . . . ." *Rowley*, at 199, n.21.

---

[5] In 1997, this portion of IDEA was amended to require the inclusion of "at least one regular education teacher of such child (if the child is, or may be, participating in the regular education environment)" and "at least one special education teacher." 20 U.S.C. § 1414(d)(1)(B).

Instead, courts must ask two questions: "First, has the State complied with the procedures set forth in the [IDEA] Act?  And second, is the [IEP] developed through the [IDEA] Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206-207.  Despite amendment to IDEA in 1997, the standards set out in *Rowley* still control.  *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d at 950-51.  Accordingly, school districts must comply with the procedural and substantive requirements of the IDEA. *See N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1207 (9th Cir.2008) (citations omitted).

The Ninth Circuit has found that "[p]rocedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *Amanda J. v. Clark County Sch. Dist.*, 267 F. 3d 877 (9th Cir. 2001).   The fact of a procedural violation, standing alone, however, does "not automatically require a finding of a denial of a FAPE.'" *M.L. v. Federal Way School Dist.*, 394 F.3d 634, 645 (9th Cir. 2005) (quoting *W.G. v. Board of Trustees of Target Range School Dist. No, 23, Missoula, Mont.*, 960 F.2d 1479, 1484 (9th Cir. 1992), *superceded by statute on other grounds, as stated in R.B. v. Napa Valley Unified School Dist.*, 496 F.3d 932 (9th Cir. 2007)).   Nonetheless, the Ninth Circuit has found that procedural violations can be sufficient to find a denial of FAPE when they " result in the loss of educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process . . . ." *Id.*

As mentioned above, the IDEA's FAPE requirement also incorporates state law standards, which in this case include California's law requiring equal communication access for students with hearing disabilities.  *See* Cal. Educ. Code § 56000.5. California's Education Code states that "[i]t is essential for the well-being and growth of hard-of-hearing and deaf children that educational programs recognize the unique nature of deafness and ensure that all hard-of-hearing and deaf children have appropriate, ongoing, and fully accessible educational opportunities." *Id.*  at § 5600.5(b)(1).  It further mandates that deaf children have "direct and appropriate access to all components of the educational process." *Id.* at § 56000.5(b)(7).  Education Code § 563459(d) sets forth requirements for IEP teams to follow when developing IEPs.  Both California law as well as the IDEA require IEP teams to consider the  services and

program options that provide students with an equal opportunity for communication access. The team shall specifically discuss the communication needs of the pupil." These factors may be "general" or "special." The general factors include an individualized look at the student's strengths, parents' concerns, assessment results, and the academic, developmental, and functional needs of the student. *See* 20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.324(a)(1) (2006); Cal. Ed. Code § 56341.1.

For students with hearing disabilities, IEP teams are further required to discuss "special factors" focused on the student's language and communication needs, opportunities for direct communications with peers and professional personnel in the student's communication mode, academic level and full range of needs, including direct instruction in the student's communication mode. 20 U.S.C. § 1414(d)(3)(B)(iv). Under California law, the teams must also consider the "related services and program options that provide the pupil with an equal opportunity for education access." Ed. Code § 56345(d). They also must consider the services necessary to ensure communication-accessible academic instructions, school services, and extracurricular activities consistent with Section 504 and the ADA. *Id.*

If parents disagree with "any matter relating to the identification, evaluation, or educational placement of [their] child, or the provision of a free appropriate public education to such child," they may obtain review through an impartial due process hearing by the state educational agency. 20 U.S.C. § 1415(f). "The School District has the burden of proving compliance with IDEA at the administrative hearing . . . ." *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996), but the burden is on the moving party at the administrative hearing. Subsequently, parties may appeal the administrative agency's decision by filing suit in district court. § 1415(i)(2)(A), (f).

## 2. The OAH Decision

**Background:**

Following an eight-day hearing that included twenty witnesses, the OAH decision in this case was rendered on June 1, 2010. The hearing examined whether the District had denied K.M. a FAPE by failing to assess, consider, and provide her with CART services, based on the June 9,

2009 and October 22, 2009 IEP meetings.  OAH Decision, AR001892.  The ALJ determined that the District did not fail to assess and consider K.M.'s need for CART services at the June 2009 and October 2009 IEP meetings and that it did not deny her a FAPE by not providing her with CART services in her June and October 2009 IEPs.

As described above, the Court reviews the findings de novo, but gives due weight to the ALJ's findings, particularly on witness credibility.  *Ashland Sch. Dist.*, 588 F.3d at 1008; *see also Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009) ("'Although the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence" therefore making the district court's review "'virtually de novo.'" (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir.1997))).

In reaching his conclusions, the ALJ made a total of eighty-three factual findings, but did not make citations to the record.  As a result, the Court must infer from the ALJ's decision as to which portions of the record he relied upon to reach his conclusions.

**ALJ's Factual Findings**

Though the Court must defer to the ALJ in weighing witness credibility, the Court is reluctant to adopt fully teacher and administrator conclusions about K.M.'s comprehension levels over the testimony of K.M. herself.  Clearly a teacher in a classroom full of more than thirty students may lack the ability to assess accurately the full comprehension of individual students.  Furthermore, K.M. has indicated that she often nods along to appear to be comprehending and that she sometimes pretends to be following.  AR001555.  As a result, though the Court does not dispute the ALJ's findings that the teachers who testified were "excellent instructors" and that their testimony was "persuasive," ALJ decision, AR001902, it nonetheless believes that K.M.'s testimony reveals that her difficulty following discussions may have been greater than her teachers perceived.  Nonetheless, as the Court will discuss below, the fact that her comprehension may have been somewhat lower than believed by the District does not necessarily suggest that K.M. was deprived of a FAPE.  To the contrary, this Court affirms

1  the ALJ's findings that the District adequately assessed K.M. and considered her request for

2  CART services.

3      The Court also questions the ALJ's characterizations of Mother's role in preventing

4  CART services from being assessed. Throughout the ALJ opinion, he emphasized what he

5  perceived as Mother's obstruction of the assessment process. He ultimately excused any failings

6  of the District to assess K.M. as rigorously as Plaintiff argues it should have because of the

7  Mother's lack of consent and some time delayed compliance with the District. This Court agrees

8  that Mother's lack of cooperation no doubt impeded the assessment process in a not insignificant

9  way. However, upon review of the record, this Court is persuaded that Mother at several points

10  sought out more information from the District before providing consent, and that the District's

11  evasiveness with her, as well as its longstanding refusal to provide CART services, may have

12  played a role in Mother's unwillingness at times to cooperate with the District. Furthermore,

13  Mother did cooperate in many of the proposed assessments, often after the District provided her

14  with additional information. *See, e.g.*, ALJ decision, AR001896 (noting that Mother did not give

15  parental consent to an April 26, 2009 assessment plan, but that after a discussion with Ms.

16  Gonzalez, she provided the necessary consent). Accordingly, the Court does not find that

17  Mother was solely responsible for any failures to assess by the District. At the same time,

18  however, the Court recognizes that Mother's role at times made timely assessments challenging.

19      **ALJ's Legal Conclusions**

20      The Court agrees with the ALJ that Plaintiff failed to meet her burden of proving a

21  deprivation of a FAPE under the IDEA at her DPH. The first conclusions determined by the ALJ

22  were that the District had not failed to assess or consider K.M.'s need for CART services at the

23  June 2009 and October 2009 IEP meetings. AR001914. These findings led to the legal

24  conclusion that there were no procedural or substantive violations of the District's obligations

25  through the IEP process.

26      The ALJ found that Mother's refusal to provide consent to the CART assessments on

27  multiple occasions had prevented any additional assessments from taking place. As described

28  above, this Court declines to place the blame solely on Mother for the failure to conduct

sufficient assessments. Mother had requested CART services since the June 2008 IEP meeting. AR001230-1231. The record reflects that her resistance to providing consent often stemmed from a lack of information. For example, in June 2009, when an assessment plan was developed, Mother asked followup questions about the kinds of assessments that would be performed, and did not receive direct answers. *See* AR 001248-1249. Mother also became frustrated by the District's insistence on using its own audiologists. Furthermore, it was not until she had filed her complaint to the OAH in July 2009 that the District began to conduct assessments and show an intent to assess. *See* ALJ decision, AR001905. It is more than understandable that Mother was frustrated and distrustful of the District, which repeatedly failed to implement CART services. It was the District's duty to provide full information to Mother so she could consent to the necessary assessments. Nonetheless, the Court's sympathy for Mother notwithstanding, it cannot be said that the District did not conduct assessments.

The second prong of the ALJ's determination that the District had not committed a procedural violation of FAPE looked at the District's consideration of CART services in the IEP meetings. K.M. contends that the District did not adequately consider providing CART services, and much of her present Motion attacks the ALJ's finding that the District's discussion of CART services was sufficient to show that it considered providing the services. Essentially, this appears to be a predetermination challenge; K.M. argues that the District had already pre-determined that it would not provide CART services, and therefore did not actually consider offering them. Predetermination of a decision not to provide specific services before an IEP can constitute a procedural violation. *See Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004); *Spielberg ex rel Spielberg v. Henrico County Public Schools*, 853 F.2d 256 (4th Cir.1988).

K.M. offers into evidence emails between District teachers and administrators that suggest that the District had predetermined its CART services denial before some of the IEP meetings. She argues that the ALJ was deprived of the ability to consider these emails, because the District did not turn them over in response to requests for K.M.'s records. Plaintiff's Motion, 16 n.3. The District insists that these emails have never been part of K.M.'s student records file.

Declaration of Misty Jones ("Misty Jones Decl."), ¶¶ 5-7.  The Court does not consider these emails for the purposes of the OAH appeal, as Plaintiff has failed to show that the emails should have been turned over before the OAH.  Indeed, at oral argument, Plaintiff's counsel conceded that the ALJ had given him the opportunity to brief the issue of the emails, but that he chose not to take it.[6]

As the ALJ correctly described, the District was required to consider and discuss both the general and special factors described above when it developed K.M.'s IEP.  K.M. argues that the mere consideration and discussion were not sufficient. Though the Court certainly has concerns about whether the District gave due weight to Mother's request for CART services, it also does not find that it failed to assess or consider those services under the law.  Based on the preponderance of the evidence in the record that the IEP team reviewed Mother's request for CART services, carefully considered K.M.'s triennial assessment, received input from K.M.'s teachers, and proposed further assessments based on K.M.'s needs, the Court agrees with the ALJ's conclusions that the District assessed and considered K.M.'s needs in relation to CART services.  *See* AR001919-1920.  Though the team could have given more weight to the opinions of Rothwell-Vivian, who had worked with K.M. since she was an infant, it cannot be said that the District's belief that CART services were not necessary resulted in a failure to actually assess or consider adequately those services.  To the contrary, the record indicates that the IEP team carefully considered the special factors.  AR000140-142; AR00153-156; AR000730-733; AR000824-829.

Even if there were procedural problems with the IEP process–namely, a failure to either properly assess or properly consider CART services–these certainly did not rise to the level of a FAPE violation.  The procedural violations that have been found sufficient to deprive a student of a FAPE have been labeled "egregious." *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d at 891; *see also M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634 (9th Cir. 2005).  Though it is true

---

[6] Nonetheless, the Court finds that even if it were to consider the emails, it would not find that the District had predetermined the issue.

that in some instances procedural violations of the IDEA can be serious enough to demand a finding of a FAPE deprivation without looking to the substantive analysis of the IDEA violations, that is not the case here. The procedural violations alleged by K.M. here are de minimus; there are no allegations that anyone, including Mother, was excluded from the IEP meetings and there was no deceit or withholding of information by the District, as true of cases in which the procedural violations were found to be egregious. *See Amanda J.*, 267 F.3d; *see also Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist.*, 317 F.3d 1072 (9th Cir. 2003). To the contrary, Mother was actively involved throughout the process–even when she was vigorously opposing the District's proposals or refusing consent to implementation of services. *See, e.g.*, Declaration of Raquel Rasmussen ("Rasmussen Decl."). Though the Court does not suggest that it was acceptable for the District to be biased against the idea of providing CART services, any preference it had against providing CART services did not manifest in a procedural violation of the IDEA sufficient to suggest a deprivation of K.M's right to a FAPE.

The Court also finds no substantive deprivation of a FAPE by the District's refusal to provide her with CART services. Under the *Rowley* "educational benefit" standard, it cannot reasonably be said that K.M. was deprived of a FAPE. For one thing, as the ALJ held, Plaintiff has not demonstrated a need for CART services; rather, she has just shown that it would likely offer a benefit for her. This Court agrees with the ALJ's finding that the testimony of Rothwell-Vivian, as discussed above, as well as of Sandy Eisenberg and Ms. Greenya did not establish that K.M. in particular needed the services. *See* AR000318-330 (Ms. Eisenberg's testimony that CART may provide generic benefits to a student, but that she had never met or examined K.M. specifically); AR000408-455 (Ms. Greenya's testimony about the extent of K.M.'s hearing loss and also revealing little information about K.M.'s classroom performance).

As the ALJ noted, the facts of *Rowley*, though not identical, are applicable. In *Rowley*, the student was a young, deaf girl, whose parents insisted that she be provided with a sign-language interpreter in all her classes. *Rowley*, 458 U.S. at 184. After assessing the student and determining that she did not require those services given the fact that she was performing well socially and academically, the parents brought a request for due process. *Id.* at 185. An ALJ

ruled in favor of the school district, but on appeal, the district court found that the school district had denied the child a FAPE because of the disparity between her achievements and her potential. *Id.* The Supreme Court reversed, and established the *Rowley* educational benefit standard discussed above.

To be sure, this case is somewhat distinguishable from *Rowley*. In *Rowley*, the school district made more accommodations for the student than the District made here, even going so far as to install a teletype machine in the principal's office to facilitate communication with student's parents. *Rowley*, at 184. Furthermore, part of the basis for the school's refusal to provide student's requested accommodation of an in-class sign-language interpreter was that the interpreter himself concluded that his services were not needed. *Id.* In this case, the testimony of Rothwell-Vivian, among others, indicates that there would be at least some benefit to the CART services. *See* AR000895-947. Indeed, the District does not dispute that the CART services would help K.M. Finally, the student in *Rowley* was a first-grader, whereas K.M. is a high school student, with differing classroom needs. Despite these distinguishing factors, though, K.M. is nonetheless unable to show that her claims should have succeeded under *Rowley*'s "educational benefit" standard.

As the District emphasizes, and the ALJ stressed, K.M. has received average to above-average grades. Her teachers speak highly of her performance in classes, including class discussions. Repeated classroom observations of her performance in classes depict a student thriving despite the obstacles; her classroom participation, presentations, and feedback to other students speak highly of her classroom successes. *See, e.g.*, Rasmussen Decl. Indeed, much evidence was offered from teachers at the OAH; this evidence overwhelmingly suggested that K.M.'s performance in class did not indicate a serious need for CART services in particular. For example, one high school teacher described conducting notebook checks in class, and finding that in addition to no appearances of participation problems in class, K.M.'s notebook suggested full comprehension and little to no difficulty taking notes in class. AR000357, AR000362-363; AR002083. Though, as discussed above, the Court declines to give disproportionate weight to their perceptions of K.M.'s participation and comprehension levels over K.M.'s own testimony,

it is nonetheless clear that the District had a reasonable basis to believe that K.M. did not need CART services and that the accommodations it was making were designed–and succeeding–and providing an educational benefit for her. Indeed, as the ALJ discussed, the accommodations provided and set out in the June and October 2009 IEP meetings were reasonably calculated to provide her with educational benefit, as measured by her ability to successfully pass on to the next grade. *See* ALJ decision, AR001921-1922.

Most critically, under *Rowley*, the fact that CART services would "maximize" K.M.'s potential does not mandate the District to provide them so long as the District was providing sufficient accommodations for K.M. to offer her a reasonable educational benefit. Thus, based on the evidence relevant to the OAH, K.M. cannot show a substantive deprivation of her FAPE.

The ALJ's decision is therefore AFFIRMED.

### B.    ADA and Section 504 of the Rehabilitation Act Claims

The analysis for claims under the ADA and Section 504 of the Rehabilitation is virtually the same. *See Martin v. California Dept. of Veterans Affairs*, 560 F.3d 1042, 1047 n.7 (9th Cir. 2009); *Mark H. v. Lemahieu*, 513 F.3d 922, 937 n.13 (9th Cir. 2008) (citing *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002)). Both claims can therefore be analyzed together.

The ADA revolutionized the ways in which individuals with disabilities are treated under the law, as it called for a "clear and comprehensive national mandate for the elimination of the discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress intended for the ADA to be a broad remedial statute to combat the discrimination that has "excluded [disabled individuals] from American life." H.R. REP. 100-711 (1988). The bill established "equality of opportunity, full participation, independent living, and economic self-sufficiency" for [disabled] individuals." 42 U.S.C. § 12101(a)(7). The bill's expressed intent was to accommodate the disabled in a wide range of activities. More specifically, the ADA's language addressed an objective of removing "the discriminatory effects of architectural, transportation, and communication barriers." *Id.* § 12101(a)(5).

The regulations promulgated under the ADA provide that a public entity "shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1)[7]. The regulations further emphasize that "a public entity shall give primary consideration to the requests of individuals with disabilities." in making its determination about the type of service needed to ensure effective communications. 28 C.F.R. § 35.160(b)(2).

K.M. argues that the communication accommodations made for her by the District failed to ensure that communications with her were as effective as with other students. Plaintiff's Motion, 14. Though the majority of her challenge focuses on her difficulty picking up on class discussions, she also points to teachers' uses of videos without closed-captioning as a barrier to her effective communication. *Id.* As a result, K.M. insists that only CART would provide her with an appropriate accommodation that would enable her communications to be as effective as her non-deaf peers. Furthermore, under the ADA regulations, K.M. argues that the District was required to give "primary consideration" to her preference for CART. 28 C.F.R. § 35.160(b)(2).

Section 504 goes even further, specifically mandating obligations on public schools to provide a FAPE. 34 C.F.R. § 104.33. The regulations explicate that an "appropriate" education includes the "provisions of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures" satisfying the requirements under the regulations." 34 C.F.R. § 104.33(b).

The District insists that, because the facts alleged by K.M. are the same for each of her claims, K.M. must prevail on her IDEA claim in order to state a claim under Section 504. Both IDEA and Section 504 address the notion of a FAPE and the FAPE standards under IDEA and Section 504 are "similar but not identical." *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir.

---

[7] The Court cites to the revised regulations, which went into effect on March 15, 2011. These regulations retained the protections already in effect, but added additional protections that are not relevant to this Order.

20

2008).  As the Court in *Lemahieu* discussed, however, the regulations for Section 504 specify that "adopting a valid IDEA IEP is sufficient but not necessary to satisfy the § 504 FAPE requirements."  *Id.* (citing 34 C.F.R. § 104.33(b)(2); *see also Scanlon by Birkner v. San Francisco Unified Sch. Dist.*, 1994 WL 860768, *10 (N.D. Cal. 1994) ("Because the District complied with the requirements of the IDEA, the District also satisfied the education requirements of the Rehabilitation Act."), *aff'd mem.* 69 F.3d 544, 1995 WL 638275 (9th Cir. 1995).  Therefore, the fact that K.M. has failed to show a deprivation of a FAPE under IDEA, as discussed above, dooms her claim under Section 504, and, accordingly, her ADA claim.  *See D.F. v. Western Sch. Corp.*, 921 F. Supp. 559, 574 (S.D. Ind. 1996) ("Other courts entering summary judgment on IDEA claims have summarily dismissed accompanying Rehabiliation Act and ADA claims.").

Indeed, it is clear that K.M.'s claims under the ADA and the Rehabilitation Act fail on the merits for the same reasons that her claim under IDEA failed.  At oral arguments, Plaintiff's counsel conceded that there is no additional evidence relevant to the remaining claims that was not considered for purposes of the OAH review.  As the Court has discussed exhaustively, Plaintiff has not shown that the District failed to give meaningful consideration to her needs; to the contrary, the District repeatedly discussed and modified K.M.'s IEP to accommodate her evolving needs.  It is true that the District did not do as much as K.M. would have liked or as much as would have been ideal.  But this Circuit has found that "a school may establish compliance with Section 504 by implementing a valid IEP."  *A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist.*, 627 F.3d 773 (9th Cir. 2010).  Accordingly, th

The Court therefore GRANTS the District's Motion for Summary Judgment on this claim.

### C.     The Unruh Act Claims

The Unruh Act, Cal. Civil Code § 51, *et seq.* provides for general damages, statutory damages, and injunctive relief for civil rights violations.  To prove a claim of discrimination under the Unruh Act, K.M. must prove intentional discrimination, or, alternatively, a violation of the ADA.  *See Munson v. Del Taco*, 46 Cal. 4th 661 (2009).  No showing of intentional

discrimination is needed to support an Unruh Act claim if the claim is premised on an ADA violation. *Lentini v. California Center for the Arts, Escondido*, 370 F.3d 837 (9th Cir. 2004). As discussed above, Plaintiff has failed to show an ADA violation. Furthermore, she has put forth absolutely no evidence indicating that the District intentionally discriminated against K.M.

Summary judgment as to this claim is therefore GRANTED.

## IV. DISPOSITION

For the reasons stated above, the Court Orders that the District's Motion for Summary Judgment is GRANTED. Plaintiff's Motion for Partial Summary Judgment is DENIED.

(1) The ALJ's Decision at the DPH is AFFIRMED. Defendant's Motion for Summary Judgment as to the appeal of the decision is therefore GRANTED. Plaintiff's Motion is DENIED.

(2) Defendant's Motion for Summary Judgment as to the ADA claim is GRANTED.

(3) Defendant's Motion for Summary Judgment as to the Section 504 of the Rehabilitation Act is GRANTED.

(4) Defendant's Motion for Summary Judgment as to the Unruh Act is GRANTED.

Defendant's pending ex parte motion to move the Pretrial Conference is hereby DENIED as MOOT.

IT IS SO ORDERED.

DATED: July 5, 2011

_____
DAVID O. CARTER
United States District Judge